United States District Court
District of Massachusetts

```
_____
                                    )
ROBERT BEVINGTON,                   )
          Plaintiff,                )
                                    )
          v.                        )    Civil Action No.
                                    )    10-10085-NMG
COMVERSE TECHNOLOGY, INC.,          )
          Defendant.                )
_____ )
```

**MEMORANDUM & ORDER**

GORTON, J.

Plaintiff Robert Bevington brings this lawsuit against his former employer, Comverse Technology, Inc. ("Comverse") for breach of contract, fraudulent misrepresentation and a violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A. Plaintiff's claim arises out of his inability to exercise stock options granted to him by Comverse.

## I.   Background

Plaintiff received stock option grants from Comverse between 1996 and 2001. Each stock option agreement contained a 10-year expiration date from the date of the grant and provided that the stock options could only be exercised while the participant was employed by Comverse or within three months after the date he or she ceased to be a Comverse employee. The stock options fully vested four years after the date of the grant.

On April 17 and 24, 2006, Comverse employees were informed

-1-

by email that the Securities and Exchange Commission ("the S.E.C.") had suspended Comverse's right to deal in or redeem its stock options due to a finding that Comverse's financial statements were unreliable.  The second email included a "Question and Answer" page addressing the consequences of the suspension of stock option exercises which informed employees that

> any extension of your stock option exercise period may
> not extend beyond ten years from the original date of
> grant of your options.

On June 19, 2007, Bevington was informed that his employment at Comverse was being terminated effective June 22, 2007.  That day, Mr. Garth Moran of Human Resources presented him with a separation package which included a pamphlet explaining that, while he would have 30 days after the prohibition on stock option exceptions was lifted in which to exercise his options, any extension of the stock option exercise period would not extend beyond 10 years from the original date of the grants of his stock options.  The package also included a letter from Mr. Steve Mandra, Vice President of Shared Services, which reiterated the same message.  Plaintiff reviewed and signed that letter.

Finally, the package included a document entitled "Agreement and Full and Final Release" ("the Release") which Bevington signed on June 25, 2007.  The Release provided for a 30-day extension of the 90-day post-severance exercise period due to the

stock trading prohibition but stated that no such extension could extend past the 10-year expiration date. Specifically, the Release states:

> Employee further understands and agrees that Employee would ordinarily have ninety (90) days from the Separation Date to exercise all vested stock options accrued under the Stock Option Agreements but that stock option exercises are currently prohibited. If there are less than thirty (30) days left in Employee's 90-day exercise period when stock options exercises can resume or, if Employee's 90-day exercise period has expired when stock option exercises can resume, Employee will have thirty (30) days from the date of written notice from the Company that stock option exercises can resume (referred to later in this paragraph as "Option Notice") to exercise Employee's stock options. Notwithstanding the foregoing, any extension of Employee's stock option exercise period may not extend beyond ten (10) years from the original date of grant of Employee's stock options.

(emphasis added). The Release constituted a "Full and Final Release" of all employee rights, including, without limitation,

> any and all actions, causes of actions, suits, debts, complaints, charges, claims, liabilities, obligations, promises, agreements, controversies, damages, and expenses (including attorney fees and costs actually incurred), of any nature whatsoever, in law or equity . . . including any and all claims relating to Employee's separation [etc.].

The effective date of the agreement was July 3, 2007. The Release specifically released Comverse from any claims for, inter alia, breach of contract, fraud, misrepresentation and promissory estoppel. In consideration for signing the Release, Bevington was paid $55,000, or 26 weeks of his full base salary.

Five months after his termination, on November 21, 2007, Bevington emailed Comverse to ask what would happen if stock

-3-

trading did not resume before his options expired.  Stock trading
had not (and has not) yet resumed.  Ms. Shefali Shah, then
Associate General Counsel for Comverse, responded that Comverse
was

> unable to unilaterally extend the expiration date of
> granted options . . . [and that] . . . the issue will not
> be considered until after the expiration date.

Due to his inability to exercise his stock options,
plaintiff filed this action in the Massachusetts Superior Court
Department for Middlesex County on December 16, 2009.  Comverse
subsequently removed the case to federal court and, on April 28,
2011, filed a motion for summary judgment which plaintiff
opposes.

## II.  Motion for Summary Judgment

### A.  Summary Judgment Standard

The role of summary judgment is "to pierce the pleadings and
to assess the proof in order to see whether there is a genuine
need for trial."  Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822
(1st Cir. 1991) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46,
50 (1st Cir. 1990)).  The burden is upon the moving party to
show, based upon the pleadings, discovery and affidavits, "that
there is no genuine issue as to any material fact and that the
moving party is entitled to a judgment as a matter of law."  Fed.
R. Civ. P. 56(c).

A fact is material if it "might affect the outcome of the

suit under the governing law." <u>Anderson</u> v. <u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." <u>Id.</u> A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u>

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. <u>Celotex Corp.</u> v. <u>Catrett</u>, 477 U.S. 317, 324 (1986). The Court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor. <u>O'Connor</u> v. <u>Steeves</u>, 994 F.2d 905, 907 (1st Cir. 1993). Summary judgment is appropriate if, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.

**B.    The Parties' Positions**

Comverse argues that plaintiff's complaint must be dismissed because 1) Bevington expressly and knowingly released any claims against Comverse arising out of the expired stock options, 2) Comverse fully complied with the documents governing the stock options, 3) plaintiff does not identify a single misrepresentation by Comverse on which he relied and 4) Chapter

93A is inapplicable to disputes arising out of the employer-employee relationship.

Almost without precedent, plaintiff submits a memorandum in opposition to the motion for summary judgment that cites no case law nor discovery record evidence.  In its reply, Comverse adds that plaintiff's failure properly to controvert its statement of undisputed material facts alone justifies the allowance of summary judgment in its favor.  Indeed, plaintiff's affidavit is not a proper Local Rule 56.1 statement because it includes argument and does not respond to all of the defendant's statements of fact.  The Court will, therefore, treat all uncontested facts as admitted.  See D. Mass. R. 56.1.

C. **Analysis**

1. **Enforceability of the Release**

The Court finds that the Release is enforceable because it was a knowing and voluntary release of liability for which plaintiff was adequately compensated.  Broad and general releases of a similar kind are "to be given effect, even if the parties did not have in mind all the wrongs which existed at the time of the release." Schuster v. Baskin, 236 N.E.2d 205, 208 (Mass. 1968) (internal quotation omitted).  The First Circuit has applied a six factor, "totality of the circumstances" approach to determining whether a release is enforceable:

(1) plaintiff's education and business sophistication;
(2) the respective roles of employer and employee in

determining the provisions of the waiver; (3) the clarity
of the agreement; (4) the time plaintiff had to study the
agreement; (5) whether plaintiff had independent advice,
such as that of counsel; and (6) the consideration for
the waiver.

Rivera-Flores v. Bristol-Myers Squibb Caribbean, 112 F.3d 9, 12

n.4 (1st Cir. 1997).

Bevington argues that he was misled into signing the

Release. He testified at his deposition that he thought he was

releasing claims associated with his termination from employment

only. Bevington claims that, before signing the Release, he

asked Mr. Moran about his right to exercise the stock options and

Mr. Moran told him "he would get back to me".

Notwithstanding that assertion, the Court concludes that,

even viewing the record in a light most favorable to Bevington,

no reasonable fact-finder could conclude that Bevington's alleged

misunderstanding was reasonable. "[C]laims of subjective

misunderstanding, standing alone [do not] defeat an otherwise

valid release." Myricks v. Fed. Reserve Bank of Atlanta, 480

F.3d 1036, 1042 (11th Cir. 2007) (quoting Pierce v. Atchison

Topeka & Santa Fe Ry., 110 F.3d 431, 442 (7th Cir. 1997)).

First, plaintiff was certainly capable of understanding the

nature of the Release. He is an educated individual who holds a

graduate degree in engineering and was a professional employee

earning approximately $110,000 annually.

Second, the Release specifically and very clearly addressed Bevington's rights with respect to his stock options and expressly releases Comverse from, inter alia, claims for breach of contract, fraud and misrepresentation.  The merger clause in the Release coherently states that the Release supercedes any other understandings and representations that took place prior to the effective date of the Release.  In sum, the Court concludes that the Release is sufficiently clear and unambiguous, especially for someone with Bevington's level of education.  See Morais v. Cent. Beverage Corp. Union Emps. Supplemental Ret. Plan, 167 F.3d 709, 711, 714 (1st Cir. 1999) (holding that similar release language was "not challenging, even for someone with only an eighth-grade education").

Bevington was also given ample opportunity to review the Release before signing it.  He had 45 days to analyze the Release before signing it and seven days to revoke the Release after signing it.  Bevington waited six days to sign the Release because he "wanted to make sure that he was covering all of his bases."  He acknowledges that he carefully read the Release more than once before signing it and understood everything, including that his stock options would expire ten years after they were granted with no extension.

Moreover, the language in the Release that relates to the stock options appeared in many documents and letters Bevington

received during the course of his employment.  Bevington had,
therefore, ample opportunity to ask questions or retain legal
assistance to help him understand his rights.

With respect to the fifth factor, Bevington did not have
independent counsel when reviewing the Release.  Nevertheless,
Bevington acknowledged at his deposition that he was aware of and
understood the Release's provision suggesting that he seek advice
from legal counsel.

Finally, Comverse paid Bevington $55,000 in consideration
for the Release.  Comverse claims that amount is approximately
five times the value of Bevington's expired stock options.  That
is certainly adequate compensation for a release of this kind.
See Barton v. Brassring, Inc., Civ. A. No. 044188, 2006 WL
3492161, at *2-3 (Mass. Super. Oct. 26, 2006) ($4,231 was
adequate consideration for a broad and general release of
liability).

Upon consideration of the totality of the circumstances, the
Court concludes that Bevington knowingly and voluntarily signed
the Release and, therefore, Bevington's claims that arise out of
conduct that occurred before its effective date are barred.

## 2.  Breach of Contract

Before the filing of his opposition to defendant's motion,
plaintiff had asserted that his breach of contract claim related
to the stock option agreements.  Plaintiff now asserts that the

suspension of trading due to misconduct by Comverse executives rendered the Release unenforceable and interfered with the normal operation of his employment and separation contracts.[1]

With respect to the Release, its enforceability depends upon whether plaintiff knowingly and voluntarily executed it, as analyzed above. The suspension of stock trading occurred before the execution of the Release and was specifically addressed in the Release. Comverse's misconduct that led to the suspension of stock trading does not, therefore, render the Release unenforceable and plaintiff cites no case law to the contrary.

With respect to the stock option agreements, plaintiff's theory of breach is that Comverse caused the suspension of trading and, therefore, caused his inability to exercise his stock options before the expiration date. That theory is somewhat more plausible but, again, plaintiff offers no caselaw support. In any event, that conduct occurred before the effective date of the Release and, as such, plaintiff is barred from bringing a related claim.

### 3. Misrepresentation

In support of his claim for misrepresentation, Bevington declares that he was led to believe that accommodations would be

---

[1] Bevington has also expressed confusion at not being compensated in the same way as other employees whose options expired in January, 2008. The difference, however, is that he was no longer an employee at that point. The subject compensation was provided to current employees only.

undertaken so that he could exercise his stock options once the S.E.C.'s suspension of trading was lifted. Although the Release bars claims arising from alleged misrepresentations occurring before its effective date and the Court need not address those, the Court nonetheless finds that there is no evidence of any actionable misrepresentation occurring either before or after the effective date of the Release.

In order to prevail on a claim for misrepresentation in Massachusetts, the plaintiff must prove

> a false statement of material fact made to induce the plaintiff to act, together with reliance on the false statement by the plaintiff to the plaintiff's detriment.

Gura v. Dias, 904 N.E.2d 494, at *1 (Table) (Mass. App. Ct. 2009) (quoting Zimmerman v. Kent, 575 N.E.2d 70 (Mass. App. Ct. 1991)).

Comverse has provided the Court with ample documentation evidencing that the ten-year expiration period was repeatedly and clearly communicated to employees who received stock option grants. For example, that information was made clear in the stock option agreements and a brochure about the program distributed in December, 2000. In its two emails in April, 2006 informing employees of the mandatory prohibition on stock option exercises, Comverse clearly stated that the options would expire at the ten-year mark even if that occurred before trading resumed. Moreover, as explained above, Bevington's separation package included two documents that enumerated Comverse's policy

with respect to stock options.

Bevington maintains that the message conveyed at quarterly and bi-weekly meetings concerning the suspension of stock trading was that, if there was no solution before the expiration date of the options, some form of compensation would be provided. At his deposition, however, Bevington acknowledged that nobody at any of those meetings told him, in words or in substance, that the ten-year expiration provision would be ignored.

Bevington argues that an email from Ms. Shefali Shah, then Associate General Counsel for Comverse, on December 14, 2007, constitutes a misrepresentation upon which he relied. In that email, Ms. Shah stated, among other things:

> Comverse is unable to unilaterally extend the expiration date of granted options. Comverse's management and board are aware of the expiration date in January 2008. No action has been taken with respect to the upcoming expiration date and the issue will not be considered until after the expiration date.

Bevington claims that Ms. Shah's email indicates that something would be done in the future with respect to the expiration date. If there was any doubt, however, Ms. Shah's subsequent email on February 13, 2008 makes it abundantly clear that

> Comverse cannot, extend your exercise rights beyond the ten year anniversary of the date of grant (the expiration date), as this term is embodied in the governing option plans approved by its shareholders.

Her email on March 3, 2008 repeated the message verbatim.

With respect to any representations made at the meetings and Ms. Shah's email, the Court concludes that no reasonable fact-finder could find that Bevington's alleged reliance was reasonable.  See Elias Bros. Rests., Inc. v. Acorn Enters., Inc., 831 F. Supp. 920, 926 (D. Mass. 1993) ("false statements of opinion, of conditions to exist in the future, or of matters promissory in nature are not actionable.").  Even viewing the record in the light most favorable to the plaintiff, those representations could, at most, be understood as opinions about actions that might take place in the future.  Such opinions, even if false, are not actionable because it is not reasonable to rely upon them.  See id. at 927.  Moreover, when asked what he did in reliance on statements at the meetings, Bevington responded: "There was nothing I could do.  I could not exercise my options." Thus, Bevington can show neither misrepresentation nor reliance and his claim for misrepresentation will be dismissed.

### 4.   Chapter 93A

In order to prevail on a Chapter 93A claim, plaintiff must prove 1) unfair or deceptive acts or practices in the conduct of any trade or commerce and 2) a causal relationship between those acts and the claimed loss.  Mass. Gen. Laws ch. 93A, § 2; Aspinall v. Philip Morris Cos., 813 N.E.2d 476, 491 (Mass. 2004). The complained of conduct must arise from "a commercial transaction between a person engaged in trade or commerce with

another person engaged in trade or commerce." <u>Aretakis</u> v. <u>Gen.</u>
<u>Signal, Inc.</u>, Civ. A. No. 05-10257, 2006 WL 1581781, at *9 (D.
Mass. June 7, 2006) (citing <u>Szalla</u> v. <u>Locke</u>, 657 N.E.2d 1267
(Mass. 1995)).

Disputes arising out of the employer-employee relationship
do not meet the trade or commerce requirement. <u>Powderly</u> v.
<u>MetraByte Corp.</u>, 866 F. Supp. 39, 44 (D. Mass. 1994) ("Powderly's
claim to his bonus rests on the very Agreement that created an
employee/employer relationship, his Chapter 93A claims against
MetraByte arise from that relationship, and are barred."); 
<u>Manning</u> v. <u>Zuckerman</u>, 444 N.E.2d 1262, 1265-66 (Mass. 1983)
(holding that the employment context does not constitute an
"arms-length commercial transaction between distinct business
entities").

Here, Bevington's claims indisputably arise from the
employment context because they relate to stock option incentives
granted to him as part of his compensation and his separation
agreement with his employer. Thus, the trade and commerce
requirement of Chapter 93A is not met and plaintiff cannot
prevail on that cause of action. <u>See</u> <u>Powderly</u>, 866 F. Supp. at
44.

## ORDER

In accordance with the foregoing, defendant's motion for summary judgment (Docket No. 11) is **ALLOWED.**

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated June 16, 2011